ESTATE OF W. MARION HENDRY, DECEASED, RUTH T. HENDRY, AND WILLIAM M. HENDRY III, CO-EXECUTORS, AND RUTH T. HENDRY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5981-72.    Filed December 4, 1974.

*Richard A. Mullens,* for the petitioners.
*Donald W. Williamson, Jr.,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in Federal income tax due from petitioners and additions to tax for fraud under section 6653(b), I.R.C. 1954, as follows:

| Year | Deficiency | Addition to tax under sec. 6653(b) |
| --- | --- | --- |
| 1963 | --- | $1,187.48 |
| 1964 | --- | 1,987.80 |
| 1965 | $420.23 | 210.12 |
| 1966 | --- | 4,248.58 |
| 1967 | --- | 339.58 |
| Totals | 420.23 | 7,973.56 |

The deficiencies supporting the additions to tax determined for all years at bar except 1965 were paid by petitioners pursuant to an agreement with respondent and are not now before us. Nor do petitioners contest the amount of the deficiency determined for 1965. The only issues for decision are whether any part of the underpayments for each of the years involved was due to fraud so as to invoke the additions to tax under section 6653(b), I.R.C. 1954, and whether petitioners' return for 1965 was false or fraudulent with intent to evade tax so as to suspend the statute of limitations under section 6501(c), I.R.C. 1954, and allow assessment of the deficiency determined for 1965.

This case was consolidated for trial and opinion with the case of J. H. Chastain, docket No. 6963-72, but subsequent to the trial, the parties settled that case, and a stipulated decision has been entered therein.

FINDINGS OF FACT

Some facts have been stipulated by the parties and are found accordingly.

Petitioners are Ruth T. Hendry and William M. Hendry III, as duly appointed coexecutors of the Estate of W. Marion Hendry, deceased, and Ruth T. Hendry individually. At the time of filing of the petition herein, Ruth T. Hendry and William M. Hendry III were residents of Tampa, Fla.

W. Marion Hendry died by his own hand on August 17, 1970, in Tampa, Fla. Until his death, he and Ruth T. Hendry were at all times relevant hereto husband and wife. W. Marion Hendry and Ruth T. Hendry filed or caused to be filed joint income tax returns for the years at bar with the district director of internal revenue in Jacksonville, Fla. Hereinafter, "Hendry" will be used to refer only to W. Marion Hendry; Ruth T. Hendry is a party to these proceedings solely by reason of those joint returns and of her serving as a coexecutor of Hendry's estate.

Hendry received a law degree from the University of Florida in 1924. He served as municipal judge in Tampa in 1926-27 and then as judge of the Court of Crimes, Tampa, Hillsborough County, Fla., until 1931 when the Court of Crimes was abolished. From then until World War II, Hendry practiced law in Tampa. He served in the United States Coast Guard during the war and afterwards returned to resume the practice of law in Tampa. In 1952, Hendry was elected justice of the peace, district one, Hills-

borough County, Fla., a position he held until his death. He was a well-known controversial individual who wielded a good bit of political power in the area. Hendry was not an accomplished civil lawyer. He knew criminal law well; as justice of the peace he conducted preliminary hearings as committing magistrate in certain criminal cases. He had only a small law library.

Chastain's formal education consisted of 6 years of grammar school in Georgia. He and his wife operated a bar and package store in Tampa, Fla., prior to and during the period 1962-67. Chastain had befriended Alexander V. Emerson and helped take care of him in his declining years. He also did work on low-rent, improved real estate owned by Emerson.

One Alexander V. Emerson died on January 18, 1961, at the age of 97, in Tampa. Under the provisions of his will, cash bequests of $1,000 each were made to three of his nieces, and the remainder of his estate, valued in excess of $250,000, was devised equally to Hendry and J. H. Chastain. The will also provided for the nomination and appointment of Hendry and J. H. Chastain as coexecutors of the estate. Upon being advised that Emerson's relatives proposed to challenge the will, Hendry and Chastain agreed, with the approval of the County Judge's Court of Hillsborough County, Tampa, Fla., to pay $55,000 to the relatives, and did so during 1961, 1962, and 1963, from the Emerson estate.

Letters testamentary were issued to Hendry and Chastain as coexecutors of the Emerson estate on January 25, 1961, by the County Judge's Court. From that time until Hendry's death, he and Chastain acted as coexecutors of the estate. Since Hendry's death, Chastain has sought to act as sole executor.

A Federal estate tax return was filed for the Emerson estate with the district director of internal revenue in Jacksonville, Fla., on May 17, 1962. A Federal fiduciary income tax return for the Emerson estate for the period January 18, 1961, through December 31, 1961, was filed with the district director of internal revenue in Jacksonville on May 2, 1962. It reflected a total loss for the period of $5,864.97, and showed no distributions to beneficiaries. No fiduciary income tax returns were filed for the Emerson estate for the period from 1962 through 1967 until delinquent fiduciary returns for those years were filed by Chastain on October 5, 1970, after the commencement of respondent's investigation in the case at bar.

Both the estate tax return and the 1961 fiduciary income tax return filed by or for the Emerson estate were signed by Hendry and Chastain as coexecutors and by William H. Frecker, attorney, as preparer. Frecker had been employed by the coexecutors to represent the Emerson estate.

Frecker has practiced law in the Tampa area since 1932 and had known Hendry since they had both been children. Frecker had prepared the will of Alexander V. Emerson and performed duties as the estate attorney, including preparing and filing the returns above. Frecker obtained the information for the returns from C. Mortimer Saunders, Hendry's clerk, principally in the form of worksheets prepared by Saunders. Frecker knew generally that distributions of estate corpus are not taxable to the recipient beneficiaries but that distributions of estate income are so taxable. In discussions with Hendry and Chastain, Frecker informed them that they were not required to report or pay taxes upon distributions of the estate to them which were included in the estate appraisal. The record does not indicate whether Frecker made clear to Hendry and Chastain that he was speaking only about distributions of corpus and not also about distributions of income. Frecker did not specifically state to Hendry and Chastain that they were required to report and pay taxes upon distributions of income from the estate.

Annual probate returns, or similar accountings, were also required to be filed by the estate executors in the probate proceedings in the State of Florida unless all heirs or other interested parties had filed a written waiver. No such waiver was ever filed in the Emerson estate. Accordingly, Frecker prepared annual probate returns to be filed with the Florida Probate Court for at least the period from 1961 through 1965. Only the returns for 1961 and 1962 actually were filed, however. Frecker did not personally file any of the returns; after he prepared them, he left each to be examined by Hendry and Chastain. The first probate return showed one disbursement of $1,000 to Hendry, as "adv. as Executor's fee." The second return showed four disbursements to Hendry totaling $2,050. The third return, which covered 1963, the first of the years now at bar, and which was not filed with the Probate Court, showed 20 disbursements to Hendry totaling $14,648.18. No other State probate returns were filed.

Prior to Hendry's death, the Emerson estate's books and records were kept and maintained in Hendry's office under his

supervision by his clerk, C. Mortimer Saunders, a county employee. All banking records covering the account of the Emerson estate were mailed to the estate c/o W. Marion Hendry, Hillsborough County Courthouse, Tampa, Fla., during 1962 through 1967. Similarly, all other estate receipts, checks, and reports went to Hendry.

Saunders' workpapers, which recorded funds deposited in the Emerson estate bank account, were the only accounting records for the estate. Saunders also maintained the estate's checkbook and made out all checks pursuant to only Hendry's instructions. Saunders was responsible, and responsive, solely to Hendry. Saunders would not have given information to anyone, including Chastain, the estate's coexecutor, unless Hendry so directed him.

Hendry opened all mail that came to his office and gave Saunders estate rental checks which Hendry wanted deposited in the estate bank account. Some estate checks were cashed by or on behalf of Hendry and were not recorded by Saunders, at Hendry's direction; nor did Saunders inform Chastain that such checks were being so treated by Hendry.

Saunders was somewhat unsure as to proper tax treatment of estate income distributed to beneficiaries, but in any event he never discussed that topic with Hendry. Nor during the period from 1961 through 1967 did Saunders deliver any information about the estate to David M. Schwartz, whose accounting office prepared Hendry's personal income tax returns. It was not until after respondent began his investigation in the present case that Saunders delivered all of his records regarding the estate to Schwartz. Thereafter, Saunders ceased keeping records on the estate.

Hendry's Federal income tax returns for the years 1963 through 1967 were prepared in the office of David M. Schwartz, C.P.A., Tampa, Fla., by Charles W. Owen, an accountant employed in that office, based on information furnished by Saunders and Hendry. Schwartz signed each return as preparer. Owen had no knowledge of the Emerson estate until after the investigation began and Schwartz told the examining agents that he had no knowledge of the estate until the investigation began.

After respondent's agents began their investigation in the present case, Owen prepared fiduciary income tax returns for the Emerson estate for the years at bar. Those returns, which were not filed with respondent, showed no distributions by the estate

to any beneficiary: After respondent's inquiry had been instituted, Hendry and Schwartz had conferred and decided to treat the moneys withdrawn from the estate as loans to Hendry.

The present case arose from an audit by respondent of Hendry's tax returns for the years at bar. When respondent's agent contacted Hendry, Hendry referred him to Schwartz, Hendry's accountant, for Hendry's income tax records. Schwartz's office supplied the records, and, when the agent requested them, Hendry's bank statements. Hendry also contacted Frecker, his attorney, and directed him to turn over all information to respondent's agents. At first, Hendry told Frecker he would not waive his attorney-client privilege, but he then countermanded that statement and instructed Frecker to cooperate fully with respondent's agents.

Upon examining Hendry's bank statements, respondent's agent found that all deposits were in a normal range for a county employee of Hendry's position, except for one abnormally large deposit of $55,000. Schwartz could not identify the source of the item. Hendry identified it as coming from the Emerson estate, but referred the agent back to Schwartz for further information. Thereafter both Schwartz and Hendry were consistently politely evasive about the item and the Emerson estate. Each repeatedly referred the agent to the other; neither thereafter yielded any information about the item or the estate. In the agent's opinion, but for the abnormally large entry in Hendry's bank statements, he would not have been led to the investigation of the Emerson estate which resulted in the present proceedings.

Schwartz died a few days before Hendry; Hendry killed himself on the afternoon of Schwartz's funeral.

The Federal estate tax return for the Emerson estate reported a total gross estate on the alternative valuation date of $244,803.38, of which $231,420 was real estate.

The Emerson estate owned numerous rental properties. Except for one such property, rent from which was paid directly to the estate, two Tampa realtors handled the collection of all rents and the maintenance of the properties and remitted monthly checks to the estate for amounts due it.

The Emerson estate realized dividend and rental income during each of the years 1962 through 1967 and profits from the sale of real estate in 1963, 1964, and 1966 as follows:

| Year | Interest | Gross rents | Sale profits | Total income |
|------|----------|-------------|--------------|--------------|
| 1963 | $23.30 | $24,355.75 | $46,266.86 | $70,645.91 |
| 1964 | 24.24 | 17,489.00 | 44,276.38 | 61,789.62 |
| 1965 | 26.82 | 16,479.19 | --- | 16,506.01 |
| 1966 | 28.48 | 11,432.50 | 97,019.50 | 108,480.48 |
| 1967 | 32.73 | 11,113.00 | --- | 11,145.73 |

During the period commencing on January 1, 1962, and continuing through December 31, 1967, the Emerson estate realized total income (without taking into account depreciation deductions) of $242,585.07, consisting of ordinary income of $45,022.33 and capital gains of $187,562.74.

All of the rental checks representing collections of rent for the Emerson estate were received by Hendry; some were retained by him and either deposited in his personal account or used by him personally. For the years 1963 through 1967, the total of the checks retained by Hendry was as follows:

| Year | Retentions | Year | Retentions |
|------|-----------|------|-----------|
| 1963 | $2,373.75 | 1966 | $5,096.87 |
| 1964 | 5,942.25 | 1967 | 3,221.45 |
| 1965 | 4,308.25 | | |

All of the net proceeds from real estate sales in 1963, 1964, and 1966 were deposited in the Emerson estate's bank account, except for one check in the amount of $667.40 received on August 29, 1966, which was cashed by Hendry from his justice of the peace office funds.

Commencing on March 6, 1962, and continuing through December 19, 1967, the Emerson estate made disbursements by check to Hendry and Chastain, which may be summarized as follows:

| Year | Total payments | Hendry | Chastain |
|------|----------------|--------|----------|
| 1962 | $9,250.00 | $2,050.00 | $7,200 |
| 1963 | 24,648.18 | 14,648.18 | 10,000 |
| 1964 | 82,721.60 | 42,721.60 | 40,000 |
| 1965 | 10,300.00 | 9,550.00 | 750 |
| 1966 | 118,500.00 | 59,000.00 | 59,500 |
| 1967 | 2,000.00 | 1,000.00 | 1,000 |
| Totals | 247,419.78 | 128,969.78 | 118,450 |

The checks evidencing the above payments were signed by Hendry and Chastain as coexecutors.

The largest disbursements by the estate were of $55,000 each to Hendry and Chastain on January 31, 1966. On the same day, Hendry deposited his payment to his personal account at the International Bank of Tampa and then still on January 31, 1966, withdrew from the account the amounts of $40,000 and $13,211.25, which he used to purchase six cashier's checks in the amounts of $10,000, $10,000, $10,000, $10,000, $7,656.25, and $5,555, respectively. One cashier's check for $10,000 was cashed; one was deposited in Hendry's name with Tampa Federal Savings & Loan Association; one was deposited in his personal account at Tampa Bay Bank; and one was negotiated for cash at the International Bank of Tampa. The remaining two cashier's checks for $7,656.25 and $5,555 were paid to the International Bank of Tampa for application on loans to Hendry from that bank.

Taxable distributions received by Hendry from the Emerson estate for the years at bar are summarized as follows:

| Year | Ordinary income | Capital gain | Total | Less depreciation | Increase in income |
|------|-----------------|--------------|-------|-------------------|--------------------|
| 1962 | $2,050.00 | --- | $2,050.00 | $880.07 | $1,169.93 |
| 1963 | 1,921.02 | $14,850.91 | 16,771.93 | 2,035.57 | 14,736.36 |
| 1964 | 3,892.58 | 22,138.19 | 26,030.77 | 2,244.79 | 23,785.98 |
| 1965 | 4,723.57 | --- | 4,723.57 | 3,451.92 | 1,271.65 |
| 1966 | 2,732.76 | 48,509.75 | 51,242.51 | 1,621.87 | 49,620.64 |
| 1967 | 3,706.60 | --- | 3,706.60 | 2,500.42 | 1,206.18 |

No portion of the estate income was reported on timely filed fiduciary returns; nor did Hendry or Chastain timely report the profit portion of moneys distributed to them from the estate on their original income tax returns for any of the years in question. However, the delinquent fiduciary tax returns filed by Chastain on October 5, 1970, on behalf of the Emerson estate for 1962 through 1967 reflect income (losses) and distributions of the estate as follows:

| Year | Net income | Hendry | Chastain | Estate |
|------|------------|--------|----------|--------|
| 1962 | $3,104.27 | $1,252.14 | $1,252.13 | $600 |
| 1963 | 46,725.92 | 23,062.96 | 23,062.96 | 600 |
| 1964 | 46,637.24 | 23,018.62 | 23,018.62 | 600 |
| 1965 | (1,359.68) | (679.84) | (679.84) | --- |
| 1966 | 94,816.21 | 47,108.10 | 47,108.11 | 600 |
| 1967 | 1,928.87 | 664.43 | 664.44 | 600 |

In respondent's computation of taxable distributions to Hendry from the Emerson estate, the increases in income in the years

1963, 1964, and 1966, as summarized above, were decreased in the amounts of $7,425.45, $11,069.09, and $24,254.87, respectively, representing the 50-percent deduction for capital gains under the provisions of section 1202, I.R.C. 1954. Accordingly, the taxable income of Hendry from the Emerson estate for 1962 through 1967 was as follows:

| Year | Taxable income | Year | Taxable income |
|------|------|------|------|
| 1962 | $1,169.93 | 1965 | $1,271.65 |
| 1963 | 7,310.91 | 1966 | 25,365.77 |
| 1964 | 12,716.89 | 1967 | 1,206.18 |

On February 15, 1971, a partial agreement was executed on behalf of Hendry's estate and Ruth T. Hendry reflecting income tax deficiencies for 1963, 1964, 1966, and 1967 in the amounts of $2,374.96, $3,975.59, $8,497.16, and $679.15, respectively.

On February 17, 1972, Hendry's estate and Ruth T. Hendry made advance payments of Federal income taxes and interest as follows:

| Year | Tax | Interest |
|------|------|------|
| 1963 | $2,374.96 | $1,116.23 |
| 1964 | 3,975.59 | 1,629.99 |
| 1966 | 8,497.16 | 2,464.18 |
| 1967 | 679.15 | 156.20 |

These amounts were assessed on May 15, 1972.

In his statutory notice of deficiency issued to Hendry's estate and Ruth T. Hendry on June 14, 1972, respondent determined that Hendry, as a beneficiary of the Emerson estate, received in the years 1963 through 1967 taxable income from the estate in the respective amounts of $7,310.91, $12,716.89, $1,271.65, $25,365.71, and $1,206.18; and that since no part of such amounts was reported on Hendry's returns, income for those years was to be increased by those amounts, respectively. These adjustments were accepted by petitioners in the agreement executed on February 15, 1971.

Because of respondent's allowance to petitioners of a casualty loss deduction of $12,500 for 1962, respondent determined neither a deficiency in taxes for 1962 nor an addition to tax under section 6653(b), I.R.C. 1954, for that year.

Farm losses were reported on each of Hendry's individual income tax returns for the years 1963 through 1967 as follows:

| | 1963 | 1964 | 1965 | 1966 | 1967 |
|---|---|---|---|---|---|
| Farm income | 0 | 0 | 0 | 0 | 0 |
| Farm expense: | | | | | |
| Labor hired | $225 | $225 | $225 | $450 | $550 |
| Seed, fertilizer | 360 | 360 | 410 | 390 | 430 |
| Repairs, maintenance | --- | --- | --- | 430 | 460 |
| Farm (loss) | (585) | (585) | (635) | (1,270) | (1,440) |

During the years at bar there were 85 orange trees on the Hendry homesite in Tampa, lining both sides of the driveway leading to the house. Hendry had no other farming activities. The farm losses claimed for those years, as above, related to the Hendry premises. In the notice of deficiency dated June 14, 1972, respondent disallowed the farm losses claimed for the years at bar, noting at the same time that petitioners had accepted that adjustment, too, in the partial agreement with respondent executed February 15, 1971.

Hendry had claimed similar farm losses on his returns for years prior to those at bar. In an examination by respondent of Hendry's returns for 1953, 1954, and 1955, respondent proposed several adjustments, including the disallowance of farm losses claimed for those years. Hendry and Schwartz agreed to the adjustments, although Schwartz, in subsequent discussions with respondent's agents, took the position that the farm losses were properly deducted by Hendry.

## ULTIMATE FINDINGS OF FACT

For the years 1963 through 1967, Hendry underpaid his income tax required to be shown on his returns for those years, and those underpayments were due to fraud in the amounts determined by respondent.

Hendry's returns for the years 1963-67 were false or fraudulent with the intent to evade tax.

## OPINION

In this case, respondent alleges that W. Marion Hendry (hereinafter Hendry), whose wife and the executors of whose estate are the petitioners herein, received taxable distributions of income from an estate of which he was coexecutor and, with fraudulent intent, failed to pay Federal income tax on such distributions in the years 1963 through 1967.

Petitioners waived restrictions on assessment and collection of deficiencies as to the years 1963, 1964, 1966, and 1967, and paid the amounts of tax determined by respondent to be due for those years. Petitioners have also conceded the amount of the tax underpayment determined by respondent for the year 1965. The only questions for decision are whether the underpayments determined by respondent were due to fraud so at to invoke 50-percent additions to tax under section 6653(b), I.R.C. 1954,[1] and whether the joint return of Hendry and his wife for 1965 was false or fraudulent with intent to evade tax so that the statute of limitations does not bar assessment and collection of the deficiency determined for the year 1965 under section 6501(c)(1).

Because this case involves allegations of fraud and intent to evade tax, the burden of proof is on respondent and must be met by clear and convincing evidence. *Steiner v. Commissioner,* 350 F. 2d 217, 220 (C.A. 7, 1965); *Ross Glove Co.,* 60 T.C. 569, 607-608 (1973); sec. 7454(a); Rule 142, Tax Court Rules of Practice and Procedure.

Section 6653(b) provides that "if any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." Petitioners concede that Hendry underpaid his Federal income taxes for the years at bar and also concede that respondent has adequately established every element necessary to sustain a finding of fraud save one. Petitioners' only argument is that respondent did not show the underpayments to be due to fraud because he did not establish that Hendry knew that he, individually rather than the estate, was taxable on distributions of income from the estate. Petitioners contend that sections 661 and 662, which provide, generally, that distributions of income by an estate to beneficiaries are taxed to the beneficiaries and not to the estate are recondite and that Hendry may well have believed he was not required to show the distributions on his own returns.

In support of this argument petitioners, we believe, attempt to limit too narrowly the evidence that may be considered in determining Hendry's intent and to place too heavy a burden of proof on respondent. Hendry was deceased at the time of the trial

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

and could not be questioned about his knowledge of tax law or his intent, i.e., whether he thought the income of the estate was taxable to the estate or was taxable to the beneficiaries. So we must determine these factors from other evidence.

Generally * * * evidence of fraudulent intent must be gleaned by surveying the whole course of conduct of the taxpayer with respect to the transactions in question. * * * Furthermore, we are entitled to consider the entire record to find evidence of fraud, and we are not limited to the respondent's affirmative evidence on that issue. *Frank Imburgia,* 22 T.C. 1002, 1014 (1954); *Wallace H. Petit,* 10 T.C. 1253 (1948); *L. Schepp Co.,* 25 B.T.A. 419, 440 (1932). [*Nathaniel M. Stone,* 56 T.C. 213, 224 (1971).]

We believe the record before us establishes clearly and convincingly that petitioner's intent with respect to the income of the estate of which he was coexecutor was to reduce it, by fraud, to his possession free of Federal income tax. The evidence shows that Hendry had complete knowledge of the Emerson estate's financial affairs and exclusive control over its records. Hendry was on notice of the need annually to prepare and file Federal fiduciary income tax returns and State probate returns for the estate: Hendry had signed, as coexecutor, a Federal fiduciary return for 1961 (the only one filed for the estate prior to or during the years at bar); State probate returns for the years 1961 through 1965 were submitted to him by the estate's attorney but he did not file the returns after 1962. Nonetheless, Hendry did not file, or cause to be filed, either Federal fiduciary income tax returns or State probate returns for the years at bar.

Hendry placed himself in complete and exclusive control of the estate and its income. All of the income of the estate, both from rents and sales of property, was received by Hendry personally; and all of the records of the estate were kept in his office under his directions. He apparently did not consult with either his coexecutor, Chastain, or with the attorney representing the estate with regard to filing returns and reports for the estate, making distributions from the estate, or accounting for the estate and its income, despite the fact that Chastain, at the urging of his accountant, inquired about these matters from time to time, and despite the fact that the attorney had prepared a fiduciary income tax return which was filed for the estate for 1961 and continued to prepare and forward to Hendry for filing probate reports for the estate through 1965. Hendry received rent checks payable to the estate which he caused to be cashed, and the

proceeds given to him, without being entered in the estate's records. Hendry did not disclose to his own accountant, who prepared his individual income tax returns, information about the Emerson estate and the income he was receiving therefrom, nor did he inquire of his accountant who should pay tax on such income.

In their brief, petitioners concede that Hendry's conduct of the estate's tax matters was fraudulent. The thrust of their defense is that such fraud was limited to the estate and did not extend to Hendry's individual tax affairs. One shortcoming in this argument, however, is that it overlooks the extent to which Hendry's personal interests were intertwined with his management of the estate. Petitioners' position would be far more persuasive if Hendry's expectations from the estate had been only his executor's commissions and perhaps a minor bequest as well. But Hendry's status as not only coexecutor but also one of the two cobeneficiaries of the bulk of the estate presents a different situation. Any benefit or detriment to the estate would redound to Hendry's own benefit or detriment: fraud which would allow the estate to receive income free of tax would directly augment Hendry's personal share of the estate. Based upon the record as a whole, we thus conclude that Hendry's intent in failing to file returns on behalf of the Emerson estate was not to benefit the estate as an isolated entity by freeing it from taxes, but was to consummate the broader objective of bringing the estate's income into his own hands undiminished by tax liability.

It is admitted that Hendry was fraudulently concealing the estate's receipts from the Federal Government by failing to file fiduciary returns on behalf of the estate; similarly, Hendry failed to file State probate returns which would have disclosed the estate's incomes and disbursements to the State of Florida. He also cashed checks payable to the estate and directed that they not be recorded on the records of the estate. We conclude that Hendry's purposeful failure to record the retained checks was aimed at concealment, not merely from any Government, but also from other private parties—perhaps, for example, Chastain, Hendry's coexecutor and cobeneficiary—who might have had claims on the proceeds.

Petitioners argue that the addition to tax for fraud under section 6653(b) should nonetheless not be imposed because respondent has not shown that Hendry was aware as a technical

matter that income distributions from an estate are to be reported on the recipient beneficiary's return. We believe to the contrary, that the record establishes that in all probability, Hendry did know himself to be taxable on amounts he received from the estate. Hendry had seen and signed at least one Federal fiduciary return for the estate and was on notice that such returns would disclose not only the estate's receipts but also its disbursements to him. The only fiduciary return filed for the estate, that prepared for 1961, showed no disbursements to beneficiaries, whereas returns for the years at bar would have shown said disbursements; after respondent had commenced his investigation in the present case, Hendry and his accountant prepared, but did not file, delinquent fiduciary returns for the estate, which stated that no distribution had been made to beneficiaries. Taking into account Hendry's consistent general pattern of concealment of the estate's and his own receipts, we conclude that in all likelihood Hendry was aware of his Federal tax liability on his receipts and fraudulently sought to avoid the same.

There can be little doubt from the record that Hendry knew that the income of the estate was taxable either to the estate or to the beneficiaries. We believe that it would be more reasonable to assume that an attorney, not knowledgeable in income tax law, if such was the case with Hendry, would think that the income or profit received by the estate and distributed to him would be taxable to him rather than the estate because we assume that most taxpayers realize that income received by them is taxable to them unless there is some provision of the law that makes it nontaxable. On such assumptions, Hendry would have had to examine the law to determine that the income was taxable to the estate rather than himself as beneficiary-distributor. Had he done so, there would, at least, have been uncertainty in his mind, and if his intent had been to properly report the income, he could have consulted the attorney for the estate or his own accountant. Furthermore, if his reason for not reporting the income on his own returns was that he thought it was taxable to the estate, he had ample opportunity to disclose this reason to the respondent's agents during the course of the investigation. We believe that is enough to carry respondent's burden of proof; it would be impossible for respondent to prove that the decedent un-

equivocally knew that he was supposed to report the income on his own returns and pay tax thereon.

We need not rely entirely, however, for disposition of the fraud penalty issue on our conclusions as to Hendry's specific knowledge of his own taxability. The purpose of section 6653(b) is not punitive but remedial: It is "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. *Helvering v. Mitchell,* 303 U.S. 391, 401 (1938). See also *George C. McGee,* 61 T.C. 249, 256 (1973). Willfulness is not a prerequisite to the addition to tax under section 6653(b). *Geiger's Estate v. Commissioner,* 352 F. 2d 221, 228 (C.A. 8, 1965). Yet under petitioners' argument, if, because of the lack of direct evidence, we are required to assume that Hendry might have erroneously believed that the income was taxable to the estate, no fraud penalty could be imposed on either the estate or Hendry individually. For, although Hendry may have intended to evade tax by not including the income in fiduciary returns, if the income was not legally taxable to the estate, there would be no tax due from the estate, and thus no "underpayment" of tax on behalf of the estate to support a fraud penalty. On the other side of the coin, based on the same assumption, even though there was an actual underpayment of tax on Hendry's individual returns, it would not have been due to fraud (because Hendry did not believe the income was taxable to him) and no penalty would be assessable against Hendry.

Under the circumstances before us, we think it sufficient that the evidence shows clearly and convincingly that Hendry was aware that the estate's income was required to be shown on some set of returns—whether the estate's or his own—that he had control over both sets of returns, and that he yet did not report the income on either in a fraudulent attempt to evade tax. Otherwise the remedial purpose of section 6653(b) would be defeated where it ought to apply.

With regard to section 6501(c)(1), it provides that in the case of a false (or fraudulent) return with intent to evade tax, the statute of limitations is lifted. Here, too, we find sufficient Hendry's overall intent to evade Federal taxes in the process of reducing the income of the estate to his own possession. Hendry's general plan was to defraud the Government of taxes rightfully due it. In furtherance of that plan, he filed returns which were at

least false (incorrect, see *Seaman v. Bowers,* 297 F. 371, 373 (C.A. 2, 1924)), and the intent and purpose of filing such returns were to accomplish the objective of that plan. We do not believe the statute requires more.

In addition to Hendry's failure to report the distributions received from the Emerson estate on his tax returns, respondent also relies on Hendry's claim of deductions for farm losses as another badge of fraud. In light of the fact that Hendry did not conduct a farming operation, did not sell any of the fruit from the orange trees that lined the driveway of his residence, deducted the same amount in several of the years here at issue, and offered no substantiation for the expenses claimed, coupled with the fact that such farm losses had been disallowed on prior years' returns, lends credence to respondent's argument.

*Decision will be entered for the respondent.*