ESTATE OF WILLIAM E. EDENS, JR., DECEASED, HARRY D. EDENS and McNEIL P. EDENS, EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Edens v. Commissioner
Docket No. 4599-74.
United States Tax Court
T.C. Memo 1981-557; 1981 Tax Ct. Memo LEXIS 180; 42 T.C.M. (CCH) 1254; T.C.M. (RIA) 81557; September 29, 1981. Harry D. Edens (executor), for the petitioner. *181 Charles P. Hanfman, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency in petitioner's Federal estate tax in the amount of $ 175,735.12, and additions to tax for fraud pursuant to section 6653(b) [1] in the amount of $ 87,867.56. The issues for decision are: (1) whether the decedent owned an interest in, or at least retained a life estate in, certain real estate, stocks, bonds, notes, mortgages, insurance policies, cash, and sundry other personal property at the time of his death; (2) whether the decedent transferred certain mortgages in contemplation of death; and (3) whether, if an underpayment of tax is found to exist, all or part thereof is due to fraud pursuant to section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated and are so found. Decedent William E. Edens, Jr., died on May 11, 1969. Two of his sons, Harry D. Edens (hereinafter Harry) and McNeil P. Edens (hereinafter McNeil), were named *182 as the executors of his estate. At the time the petition was filed herein, the executors resided in Pickens County, South Carolina. No Federal estate tax return has been filed by or on behalf of the estate. At the time of his death, the decedent was 89 years of age. He had resided in Pickens County, South Carolina (hereinafter Pickens County) for several years prior to his death. He was survived by a wife and three sons, as follows: Name
Relationship
Age
Inez Edens
wife
85
Hiott C. Edens
son
56
Harry D. Edens
son
54
McNeil P. Edens
son
53
Prior to 1969 the Pickens County property tax rolls were kept updated through a procedure whereby each four years or less owners of land would make a declaration as to the amount of property they owned. In 1965 the decedent signed a declaration that he owned 1,763 acres of real estate in Pickens County. In 1967 and 1968 he paid real property taxes on this acreage of $ 386.75 and $ 395.85, respectively. On his joint Federal income tax returns for 1967 and 1968, which McNeil signed as preparer, the decedent deducted real estate taxes on this acreage in the amount of $ 390.62 [2] and $ 395.85, respectively. *183 In April 1969, he granted the Duke Power Company a right-of-way over a portion of this land. An appraisal of this land, as of May 11, 1969, commissioned by the Assistant Attorney General, South Carolina Tax Commission, valued the land at approximately $ 400,000 for its highest and best use--timber production. A similar appraisal commissioned by the respondent placed the value at $ 343.048. On May 20, 1969, nine days after the decedent's death, two deeds supposedly executed in the late 1940's by the decedent and his wife, and allegedly transferring approximately 900 acres of the above-mentioned land in Pickens County to Harry and McNeil, were recorded in the books of the Clerk of Court of Pickens County. In one of these deeds the decedent expressly retained a life estate in 62 acres upon which his home was situated. Another deed supposedly executed by the decedent and his wife in late 1964, purportedly transferring 50 acres of land in Pickens County to Harry, was similarly recorded on July 15, 1969. On the date of the decedent's death, U.S. bonds with a fair market value of $ 180,767.13 were registered jointly in the names *184 of the decedent and either Harry, McNeil or Hiott C. Edens. On his 1965 state, and his 1967 and 1968 Federal income tax returns the decedent reported interest from U.S. Government bonds of $ 3,906.53, $ 5,301.35, and $ 5,405, respectively. McNeil signed both the 1967 and 1968 returns as preparer. Within two months after the decedent's death, series H and series E bonds in the aggregate face amount of approximately $ 168,000 were redeemed by Harry, McNeil and Hiott C. Edens. In the petition to probate the will of the decedent, filed by Harry and McNeil on June 10, 1969, the only assets declared to be owned by the decedent on the date of his death were cash of $ 7,608.72, and three $ 1,000 U.S. savings bonds. The petition also asserted that the decedent had transferred certain mortgages in the total amount of $ 4,000 to Harry on January 2, 1969. Finally, the petition to probate showed that there were four policies of life insurance on the decedent, payable to beneficiaries in the aggregate face amount of $ 29,000. Two documents were introduced at trial purporting to be "Assignment of Insurance Policies." These were supposedly signed by the decedent on June 1, 1960. On one the *185 signature read "W. E. Edens, Jr.," and on the other it appeared "W. E. Edens." Evidence shows that the decedent stopped using "Junior" as a part of his name in the 1930's when his uncle died. Harry introduced into evidence a document entitled "Sale of Personal Property," purportedly executed by the decedent on January 15, 1966, which provides in pertinent part: I W. E. Edens, * * * HAVE SOLD ALL MY PERSONAL PROPERTY TO MY SONS HARRY D. EDENS AND MC NEIL P. EDENS, INCLUDING HOUSEHOLD FURNISHINGS AS BEDS, OLD REFRIGERATOR, CHIRS [sic], TABLES, ANTIQUES AT THE OLD HOUSE, OLD PLOWS, OLD CARS, SHOP TOOLS, CHAIRS, ETC. I NO LONGER CLAIM TITLE ANYTHING.THEY, HARRY D. EDENS AND MC NEIL P. EDENS ARE GIVEN TITLE IN FEE SIMPLE. THE SALE PRICE OF $ 25.00 IN CASH PAID TO ME. THIS JANUARY 1, 1966. At trial Harry was the sole witness for the petitioner. He testified, often offering documents for support, to the following: That as each child of the decedent was born the decedent made a gift to him of $ 565,919; that a check was issued in that amount by the decedent and drawn on the Keowee Bank; that the decedent then issued another check in the same amount on behalf of the child back *186 to himself; and that the decedent then gave a promissory note to the child evidencing a loan of $ 565,919. The checks purportedly to and from Harry bore paid stamps indicating that payment was made six months prior to the time they were purportedly written. In fact, the Keowee Bank, which ceased doing business on August 11, 1928, never had deposits of over $ 262,922.45 at any time during its existence. Although not admitted into evidence, Harry offered, in connection with certain deeds and promissory notes purportedly from the decedent, a check drawn on the Keowee Bank dated January 15, 1930, and bearing a paid stamp of January 16, 1930--well over a year after the bank ceased doing business. Harry also introduced a document entitled "Power of Attorney" purportedly executed by the decedent on June 15, 1928. This document grants extensive powers to four of the decedent's sons over most, if not all, of the decedent's real and personal property. On June 15, 1928, the ages of the decedent's named sons were 14, 13, 11 and 9 years. On June 16, 1976, Harry was convicted on two counts of forgery in the Court of General Sessions, Pickens County, South Carolina. This conviction arose *187 out of Harry's submission of two affidavits (purportedly signed by the decedent) in a Pickens Countycivil court proceeding. This forgery conviction was upheld by the Supreme Court of South Carolina. State v. Edens, 250 S.E. 2d 116 (1978). Notwithstanding these events, Harry introduced these two forged affidavits into evidence in the instant case. Other documents admitted herein have been denominated forgeries in the opinion of a competent expert witness. In addition, Harry introduced into evidence purported amended Federal tax returns of the decedent for 1967, 1968 and 1969. In fact, the decedent had not filed these, or any, amended returns for the years 1967, 1968 and 1969. No Federal estate tax return has been filed by or on behalf of the decedent's estate. The respondent has determined that, on the date of his death, the decedent owned property includable in his gross estate as follows: Property
Value
Real estate
[3] $ 400,024.75
Stocks and bonds
3,000,00
Mortgages, notes and cash
7,608.72
Insurance on decedent's life
31,460.11
Jointly owned property
190,746.40
Other miscellaneous property
3,000.00
Transfers during the dececent's
life
9,974.65
Total:
$ 645,814.63
*188 The respondent has further determined that all or part of the underpayment of tax required to be shown on the estate tax return was due to fraud. OPINION It is the petitioner's position that the decedent made gifts of approximately one-half million dollars to Harry, McNeil, and other family members when they were only weeks old. The decedent then supposedly borrowed the funds back and spent the remainder of his life invesing and using the money for the benefit of his children and transferring property to them as repayment on the loans. Thus, asserts the petitioner, the decedent died a pauper--insolvent in fact--and that is why no Federal estate tax return was filed.
Respondent, on the other hand, contends that the executors fabricated the story underlying their theory herein and that, even if the facts presented by petitioner were true, the elements of a completed gift are lacking because the decedent treated all the assets as his own from the times of his children's births, and the claimed gifts, until his death in 1969. Respondent also maintains that the *189 executors failed to file an estate tax return, notwithstanding their knowledge that one was required and taxes owed because the fruits of this fraud would settle upon them as the decedent's primary beneficiaries. As to the underpayment of tax, the petitioner bears the burden of proof with regard to all aspects of the deficiency, including the items determined by respondent to be includable in the decedent's estate, as well as their date of death values. Welch v. Helvering, 290 U.S. 111 (1933), Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner has miserably failed to sustain this burden. Although we are of the opinion that many of the documents offered by the petitioner are forgeries and that the history of the decedent's wealth, as presented to us, involves significant fabrication, we cannot say with certainty that every document is false, nor that the executors alone are at fault. More likely, it appears that the decedent, in concert with Harry, McNeil, and/or Hiott C. Edens, had engaged in very "creative estate planning" since probably the 1940's. *190 We need not, however, rule on the authenticity of each and every check, deed, promissory note, and other document presented.Congress, having anticipated situations like those presented here, has provided specific statutory provisions upon which we shall rely. Section 2033 provides for inclusion in the gross estate of all property to the extent the decedent held an interest therein on the date of his death. Section 2035 provides for inclusion of property transferred by the decedent in contemplation of his death. Section 2036 requires inclusion of property transferred by the decedent in which he retained use, possession, or enjoyment for his life.Section 2040 provides for the inclusion of all property which the decedent held jointly with another to the extent of his direct or indirect contributions to the acquisition thereof. Finally, section 2042 renders includable in the decedent's gross estate the proceeds of any policy of insurance on his life in which he held an incident of ownership or which is receivable by his executor. Under the facts presented herein, and the above-discussed *191 Code provisions, we sustain respondent's determination with respect to each item specified in his statutory notice. [4]
Aside from the purported deeds, the evidence clearly shows that the decedent owned 1,763 acres of land in Pickens County, which is includable in his gross estate under section 2033. In 1965 he declared it to be his own. He paid real estate taxes thereon in 1967 and 1968, and he deducted those land taxes on his Federal income tax returns for those respective years. Finally, he granted a right-of-way over the land in 1969 to Duke Power Company. Even if, however, the deeds are authentic the result is no different. The decedent kept an iron-hand control over this property until his death as he did with his personal property. Any deeds actually executed by him were merely part of a scheme to avoid estate taxes. Accordingly, the Pickens County real estate is probably includable in his gross estate pursuant to section 2033; but even if it were not, it would be includable under section 2036. The petitioner has failed to produce any credible evidence of the value of this land. The respondent's determination of value at $ 343.048, *192 as based on the credible report of his expert witness, must be sustained. On the date of his death the decedent owned U.S. Government bonds and a bank account jointly with his wife and sons, Harry, McNeil and Hiott C. Edens. The respondent has determined the date of death value of the bonds to be $ 180,767.13, and the cash to be $ 9,979.27. The petitioner has produced no credible evidence that anyone other than the decedent provided any consideration toward the acquisition of these jointly held assets or that respondent has overvalued them. Consequently, they are includable in his gross estate at the values determined by the respondent. On the basis of the executors' declaration to state taxing authorities in South Carolina, the respondent determined the decedent owned stocks, bonds, notes, mortgages and cash in the total amount of $ 10,608.72 at the time of his death. Petitioner has produced no evidence to the contrary, thus these items are includable in the decedent's gross estate at the values determined by respondent.
Additionally, the respondent determined that the decedent owned miscellaneous personal effects with a value of at least $ 3,000 at the time of his death. *193 The petitioner introduced into evidence a document purportedly signed by the decedent on January 15, 1966, selling all of his personal property, including antiques, cars, and tools to Harry and McNeil for $ 25. Whether or not the document is authentic, the decedent continued to use, enjoy and control such property until his death. Accordingly, either section 2033 or section 2036 provides for inclusion of this property in the decedent's gross estate, and at the values determined by the respondent since petitioner has failed to prove any lower value. Respondent has also determined that proceeds of insurance policies on the life of the decedent in the amount of $ 31,460.11 must be included in the decedent's gross estate. Petitioner presented no evidence to rebut respondent's valuation, but introduced two documents entitled "Assignment of Insurance Policies," both purportedly signed by the decedent on June 1, 1960. On one document the decedent's signature appeared "W. E. Edens" and on the other it appeared "W. E. Edens, Jr." We find it difficult to believe that the decedent would have signed his name differently on two similar documents purportedly executed on the same day. Furthermore, *194 the decedent ceased using "Jr." after his name in the 1930's. For these reasons we do not believe these documents to be authentic.Thus, we find that these insurance policies were owned by the decedent on the date of his death, and are therefore includable in his gross estate under section 2042 at the values determined by the respondent. The final item of inclusion determined by the respondent is $ 9,974.65 in mortgages transferred by the decedent to Harry on January 2, 1969.Respondent alleges that these amounts were transferred in contemplation of death, and we agree. This transfer took place five months prior to the decedent's death. He was then 89 years of age. It is clear from all of the facts presented that the decedent actively sought to avoid patential estate taxes by whatever means were available. The transfer of these mortgages was merely another act in furtherance of that goal.Thus, we find the transfer to have been made in contemplation of his death and includable under section 2035. In its report to state taxing authorities, the petitioner valued these mortgages at $ 4,000, but it has presented no other evidence concerning their values. We find that the petitioner *195 has failed to overcome the presumption of correctness of respondent's valuation. The final matter presented herein is whether all or part of the petitioner's underpayment of tax is due to fraud, pursuant to section 6653(b). With respect to fraud the burden of proof is on the respondent and must be met by clear and convincing evidence. Estate of Hendry v. Commissioner, 63 T.C. 289, 299 (1974); Rule 142(b), Tax Court Rules of Practice and Procedure. Under section 6653(b), if any part of the underpayment of tax is due to fraud then there shall be added to the tax the sum of 50 percent of the underpayment. In this regard, the fraudulent intent of the executor(s) is treated as that of the estate. Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). [5]
On the record before us evidence of fraud on the part of the executors is not only clear and convincing, but overwhelming. The first indication of fraud is that the executors failed to file an estate tax return when they *196 knew the decedent owned substantial assets at the time of his death. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. 578 F. 2d 1383 (8th Cir. 1978). The best evidence that the executors knew of the decedent's vast assets is that McNeil (one of the executors) prepared the former's Federal income tax returns for 1967 and 1968, which reflected deductions for property taxes paid on land which the executors now assert was transferred by the decedent in the 1940's, 1950's and early 1960's. Furthermore, the executors owned bonds jointly with, and acquired solely by, the decedent valued at well over $ 100,000. In 1967 and 1968 the decedent reported substantial interest from these bonds on returns prepared by McNeil. It is interesting also to note that the executors recorded the real property deeds and redeemed the bonds within months after the decedent's death. Additionally, Harry introduced documents in this proceeding purportedly bearing the decedent's signature, which he was convicted of forgoing by a South Carolina court. This conviction was upheld on appeal by the Supreme Court of South Carolina, State v. Edens, 250 S.E. 2d 116 (1978), *197 thus the fact of this forgery is binding upon us. Commissioner v. Estate of Bosch, 387 U.S. 456 (1967). Moreover, credible expert testimony and other evidence revealed that numerous other documents offered into evidence by Harry are forgeries and/or false documents. A further effort to defraud the respondent is shown by Harry's introduction of three fictitious amended Federal income tax returns of the decedent for 1967, 1968 and 1969, which he testified were filed, but which in fact were never filed. Contrary to the decedent's original returns for those years, these returns showed no deduction of real estate taxes and almost no interest income from U.S. Government bonds. Other factors also indicate fraud; for instance, Harry's generally incredible testimony (including his repeated statements that he and his brothers were employed by the decedent when they were only six months old), and the fact that the executors herein, as the primary beneficiaries of the decedent's estate, stood most to gain from underpayment of tax. On the basis of all the facts and circumstances presented, we sustain respondent's determination that part, if not all, of the underpayment *198 of tax herein was due to fraud with intent to evade tax. To reflect respondent's concession as to the value of the Pickens County real estate, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.↩
2. The $ 3.87 discrepancy is not explained.↩
3. Respondent has conceded that the actual value of the real estate owned by the decedent should be $ 343,048.↩
4. See footnote 3, supra↩.
5. Estate of Wheeler v. Commissioner, T.C. Memo. 1978-15↩.